**In re LILYKNIT SILK UNDERWEAR CO., Inc.**

No. 352.

Circuit Court of Appeals, Second Circuit.
April 17, 1933.

Joseph Dannenberg, of New York City, for appellant.

Louis J. Schwartz, of New York City (David W. Kahn, of New York City, of counsel), for appellee.

Before L. HAND, SWAN, and AUGUSTUS N. HAND, Circuit Judges.

SWAN, Circuit Judge.

An involuntary petition in bankruptcy was filed against Lilyknit Silk Underwear Company, a corporation, on June 30, 1932. Thereafter, and before adjudication, the bankrupt offered terms of composition to its creditors which were accepted by a majority in number and amount. The appellant and certain other creditors filed objections. The matter having been referred to a special master, he reported adversely to the objectors. The District Court approved his report and confirmed the composition. From this order Mill Factors Corporation, one of the objecting creditors, has appealed. The appellee is the bankrupt.

Section 12d of the Bankruptcy Act (11 USCA § 30 (d) provides that "the judge shall confirm a composition if satisfied that (1) it is for the best interests of the creditors; (2) the bankrupt has not been guilty of any of the acts or failed to perform any of the duties which would be a bar to his discharge. * * * *" The appellant contends that neither condition was met; but we need consider only the second, namely, whether the bankrupt has been guilty of an act which would bar his discharge. The grounds for barring a discharge are stated in section 14b, as amended by Act May 27, 1926, § 6 (44 Stat. 663, 11 USCA § 32 (b), and the one relied upon is the obtaining of property on credit by publishing "a materially false statement in writing respecting his financial condition."

In February, 1932, the bankrupt corporation issued to R. G. Dun & Co. a financial statement as of December 31, 1931, and a copy thereof was obtained by the appellant prior to its extension of credit to the bankrupt in 1932. The statement was prepared by the bookkeeper and an accountant who assisted in making the closing entries on the books for 1931, and was signed by the president. It is attacked as false, in that under the heading of "current assets" it listed (a) accounts receivable of $37,908.64, of which $15,693.99 represented advances to its salesmen known to be noncollectible, and (b) notes receivable and loans receivable of $9,200, all of which were loans to its officers, known to be noncollectible, and (c) merchandise inventory of $33,256.25, which was grossly overvalued.

As to the last item we may say at once that the evidence is insufficient to prove the charge of fraudulent overvaluation of the inventory. The other two items require more detailed discussion.

The salesmen were employed on the basis of commissions with a drawing account, and the figure of $15,693.99 represents the advances made to them in excess of commissions earned. Part of it was for overdrafts in 1930 and the rest in 1931; just how much is attributable to each year does not appear. The notes and loans receivable of $9,200 were a note for $3,000 representing a loan to the vice president made in 1928, a note for $1,500 representing a loan to the president in 1931, and $4,700 advanced during 1931 to the general manager, who was also assistant treasurer. Mr. Mushel, the general manager, testified that at the end of 1931 neither the salesmen nor the officers were able to repay the sums they respectively owed the corporation. The special master reported that since the overdrafts and loans represented legal obligations they were properly carried on the books, and the question of the possibility of collection was not material. The District Judge expressed doubt whether these items "could properly be considered as assets at all," but resolved the doubt against the objectors because of the strong representations in favor of the composition by the larger creditors.

With neither view can we concur. If a bankrupt knows that an account is worthless, it is certainly dishonest to include it in a list of his "current assets"; and, however clearly it may appear that a composition is in the interests of the creditors, it may not be confirmed if the bankrupt has committed an act which would bar his discharge. 11 USCA § 30 (d). So the question is whether the objecting creditor has made proof of such an act. It should be noted that, if the objector shall show to the satisfaction of the court that there are reasonable grounds for believing that the bankrupt has committed an act which would bar his discharge, then the burden of proving that he has not done so shall rest upon him. Section 14b, as amended (44 Stat. 664, 11 USCA § 32 (b).

It may well be doubted whether overdrafts by salesmen can fairly be included among "accounts receivable" of a merchant. Evans, an assistant credit man of the appellant, testified that they could not. Nadel, an accountant, testified that reputable accountants did not include them. Spears, the accountant who assisted in closing the bankrupt's books for 1931, said that in "a condensed statement" they might be included. We shall assume in favor of the bankrupt that a merchant's financial statement is not necessarily

made false by listing a salesman's overdraft as an account receivable. But all of the witnesses agree that the term "accounts receivable" means liquid assets realizable within a reasonable period, which no one put beyond six months to a year. Some of these overdrafts were made in 1930, and, although demanded, had not been paid and could not be paid except out of commissions which might be earned in the future. That Mushel, the general manager, so understood, is clear from his testimony. Moreover, one of the salesmen, Stern, had been sued by the corporation in April, 1931, for $4,000, and this sum went into the total of accounts receivable as a "current asset" on December 31st. The testimony tends to show that the salesmen's overdrafts had been written off to profit and loss at the end of 1931 and then restored in March, 1932, to balance the books. Such is the testimony of Accountant Nadel, though it is denied by the bookkeeper and witness Spears. But whether they were written off or not may be regarded as immaterial. To include such doubtful and in part long overdue claims against salesmen as current accounts receivable was a plain misrepresentation of the bankrupt's liquid assets. There was no misunderstanding of their value on the part of the corporation, for the general manager knew all about the uncertainty of collecting them. If commercial statements are to be kept to a decent level of honesty, courts of bankruptcy must not ignore such laxity as is here disclosed.

Much the same may be said as to the notes and loans receivable, at least with respect to a $3,000 note of the vice president given in 1928. As to the loan to Mushel, it is doubtful whether it was a debt at all, for he testified that he was entitled to 3 per cent. commissions on the total sales, which would amount to $2,000 more than the $4,700 he drew. However, in the next breath he said he owed this sum. What the actual fact is need not be decided, for the inclusion of the salesmen's overdrafts is enough to prove the statement materially false. That the appellants relied upon the statement in giving credit is established by Evans' testimony.

The order of confirmation is reversed.

L. HAND, Circuit Judge (concurring).

I agree with all that my brothers say, but I should like to go further, though I must own that it is not necessary here. It seems to me that in the financial statement of a commercial company it is misleading to incorporate claims due from salesmen in the item, "accounts receivable." The natural, I should suppose the inevitable, interpretation of that phrase is that the amount so entered is the sum of the outstandings from dealings of the company with its customers. If I am asked how else these claims should appear, I reply that they ought to be set out as such, if they are to be used at all. No lender would then think of relying upon them as he does upon "receivables" arising in due course of trade; and that appears to me to show that the excuse for them is disingenuous. I would not mince words in defence of financial statements; rather I would hold bankrupts to their fair intendment, taken at large. To be sure, they must be fraudulent as well as false, but I should have to be well satisfied, when the bankrupt has the burden, that they were not the first, when they are the second.